[Cite as *Smith & Condeni, L.L.P. v. Cavitch Familo & Durkin Co., L.P.A.*, 2026-Ohio-1047.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

SMITH AND CONDENI, LLP, :

    Plaintiff-Appellant, :

                       No. 115362

    v. :

CAVITCH FAMILO & DURKIN :
CO. LPA, ET AL.,

                      :

    Defendants-Appellees.

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 26, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-24-105081

---

***Appearances:***

Condeni Law LLC, and Joseph A. Condeni, *for appellant*.

Gallagher Sharp LLP, Maia E. Jerin, and Monica A. Sansalone, *for appellees*.

---

MICHAEL JOHN RYAN, P.J.:

{¶ 1} Plaintiff-appellant Smith and Condeni, LLP ("S&C") appeals from the trial court's judgment granting the motion for judgment on the pleadings of defendants-appellees Cavitch Familo & Durkin Co., LPA, a law firm ("Cavitch"),

attorneys Max Dehn ("Dehn"), Madilyn Maruna ("Maruna"), Harold Maxfield ("Maxfield"), Michael Cohan ("Cohan"), and James Aussem ("Aussem") (collectively "the Cavitch defendants").

{¶ 2} After a review of the facts and pertinent law, we affirm.

**Factual and Procedural History**

{¶ 3} S&C initiated this case against the Cavitch defendants for legal malpractice stemming from the underlying litigation in *Smith & Condeni, LLP, et al. v. Condeni, et al.*, Cuyahoga C.P. No. CV-17-889339 ("the underlying action").

{¶ 4} The record demonstrates that N. Lindsey Smith ("Smith") and Joseph Condeni ("Condeni") are lawyers, and in 2007, formed the law partnership of S&C. The partnership consisted solely of Smith and Condeni. Their arrangement was governed by a written partnership agreement. Relevant articles and sections of the agreement provided as follows:

> Article 9 Matters Requiring Consent of Partners Section
> 9.3. Items Requiring Consent of a Majority of the Partners. The following actions may not be taken without the Consent of a Majority of the Partners: . . . vi. Initiation of an action on behalf of the Partnership against any Partner or Dissociated Partner.
>
> Article 16 Rights of Dissociated Partners
> Section 16.6. Rights and Duties of Dissociated Partner Under the Partnership Agreement. A Dissociated Partner shall cease to have rights and duties under this Partnership Agreement as of the Dissociation Date.

(Bold and italics deleted.)

{¶ 5} Smith and Condeni each owned a 50 percent share of S&C. In 2014, a dispute arose between the partners regarding Smith's desire to withdraw from the partnership and move his part of the practice to another law firm. Indeed, in 2015, Smith left S&C and went to Cavitch. After Smith's departure from S&C, Condeni established a new law firm.

{¶ 6} The circumstances surrounding Smith's departure from S&C, as well as Condeni's establishment of a new firm, were contentious between Smith and Condeni. In 2017, Smith and S&C filed the underlying action against Condeni and his new law firm contending that Condeni secretly retained S&C funds to establish Condeni's new law firm after Smith left S&C. Smith, therefore, sought to expel Condeni from S&C. Attorneys Dehn and Maruna represented Smith in the underlying action; they also purportedly represented S&C.[1]

{¶ 7} Condeni answered and counterclaimed, alleging that Smith withdrew from S&C as of March 2, 2015, became a dissociated partner, and lost all rights and duties as an S&C partner at that time. Condeni maintained that Smith withdrew from S&C pursuant to the parties' partnership agreement, and under Ohio law, no later than March 2015 when Smith joined Cavitch. It was Condeni's position that Smith therefore lacked standing to bring claims on behalf of S&C and that the Cavitch attorneys could not represent S&C. To that end, Condeni asserted the following affirmative defenses in his answer:

---

[1] The remaining Cavitch defendants — Maxfield, Cohan, and Aussem — denied that they had any representation in this matter. S&C alleged that their liability was vicarious because of their supposed leadership positions as Cavitch's board of directors.

[(2)] Defendants assert that plaintiff S&C lacks standing to bring this action under Section 9.3 of the Partnership Agreement as initiation of an action on behalf of S&C against a partner requires the consent of more than one half of the partners (determined per capita) at the time that lawsuit was filed, which condition precedent was not fulfilled.

[(3)] Pursuant to Section 16.6 of the Partnership Agreement, Defendants assert that Plaintiff Smith lacks standing to bring this action as Smith, being a Disassociated Partner has no rights under the Partnership Agreement as of his Disassociation Date, which was March 2, 2015.

{¶ 8} In August 2022, the trial court in the underlying action found that Smith disassociated from S&C as late as December 29, 2014, before his and S&C's claims for relief against Condeni and Condeni's new firm were alleged to have arisen. This court affirmed the trial court's judgment in May 2023. *Smith & Condeni v. Condeni*, 2023-Ohio-1480 (8th Dist.). In October 2023, the Supreme Court of Ohio declined to accept Smith's discretionary appeal. *Smith & Condeni, LLP v. Condeni*, 2023-Ohio-3670. In October 2023, S&C purportedly terminated Cavitch and, in November 2023, attorneys Dehn and Maruna withdrew their purported representation of S&C.

{¶ 9} In October 2024, S&C, by and through Condeni, filed the subject legal-malpractice action against the Cavitch defendants. According to the complaint, "In 2017, Cavitch . . . made a conscious decision to engage in the conflicted representation of [S&C and Smith] against [Condeni]" in the underlying action. Complaint, ¶ 15. S&C's complaint further alleged that "Cavitch and its attorneys represented [S&C] until [S&C] terminated Cavitch's representation on October 26, 2023. Under the continuing representation doctrine, [S&C's] statute of limitations

against Cavitch and its attorneys did not lapse before the filing of this Complaint." *Id.* at ¶ 19.

{¶ 10} The Cavitch defendants answered S&C's complaint and filed a motion for judgment on the pleadings. The Cavitch defendants' motion for judgment on the pleadings was based on the following two grounds: (1) under the authority of *New Destiny Treatment Ctr., Inc. v. Wheeler*, 2011-Ohio-2266, no attorney-client relationship between S&C and any of the Cavitch defendants existed, and (2) the complaint was filed after the one-year statute of limitations for a legal-malpractice action had expired. S&C opposed the motion for judgment on the pleadings.

{¶ 11} On July 1, 2025, the trial court issued a judgment granting the Cavitch defendants' motion for judgment on the pleadings. On July 14, 2025, the trial court issued a nunc pro tunc judgment entry granting the Cavitch defendants' motion for judgment on the pleadings "with prejudice" and stating that its judgment was "final." S&C now appeals, raising the following sole assignment of error for our review: "The trial court erred by granting the Cavitch defendants' motion for judgment of the pleadings."

**Law and Analysis**

{¶ 12} "A Civ.R. 12(C) motion for judgment on the pleadings presents questions of law, the determination of which is restricted solely to the allegations in the pleadings and any writings attached to the pleadings." *Crenshaw v. Jones*, 2022-Ohio-3913, ¶ 6 (8th Dist.), citing *Peterson v. Teodosio*, 34 Ohio St.2d 161 (1973). A motion for judgment on the pleadings can be granted when the court, after

construing the pleadings most favorably to the nonmoving party, finds beyond doubt that the nonmoving party could prove no set of facts in support of a claim for relief. *State ex rel. Midwest Pride IV, Inc. v. Pontious*, 75 Ohio St.3d 565, 570 (1996), citing *Lin v. Gatehouse Constr. Co.*, 84 Ohio App.3d 96, 99 (8th Dist. 1992). Appellate review of motions for judgment on the pleadings is de novo. *Perrysburg Twp. v. Rossford*, 2004-Ohio-4362, ¶ 5.

{¶ 13} Additionally, "a motion for judgment on the pleadings is an appropriate vehicle to use to seek a dismissal of a cause of action based on a running of the statute of limitations that is apparent from the face of the complaint." *Oskowski v. Mercy Med. Ctr.*, 1996 Ohio App. LEXIS 1042, *2 (2d Dist. Mar. 22, 1996); *Hughes v. George F. & Mary A. Robinson Mem. Portage Cty. Hosp.*, 16 Ohio App.3d 80, 82 (11th Dist. 1984). Accordingly, if "the pleadings unequivocally demonstrate that the action was commenced after the limitations period expired, Civ.R. 12(C) relief is appropriate." *Bd. of Edn. of Greenview Local School Dist. v. Staffco Constr., Inc.*, 2016-Ohio-7321, ¶ 12 (2d Dist.).

{¶ 14} As mentioned, the Cavitch defendants based their motion for judgment on the pleadings on two theories: (1) that no attorney-client relationship between S&C and any of the Cavitch defendants existed, and (2) the complaint was filed after the one-year statute of limitations for a legal-malpractice action had expired. The two theories are intertwined.

{¶ 15} As to the statute of limitations, R.C. 2305.117(A) provides that a legal-malpractice claim "shall be brought within one year of the time the cause of action

accrued." A cause of action for legal-malpractice accrues, and the statute of limitation begins to run, when (1) there is a cognizable event whereby the client discovers or should have discovered that his or her injury was related to the attorney's action or omission, putting the client on notice of a need to pursue any possible remedies against the attorney or (2) the attorney-client relationship for that particular transaction or undertaking terminates, whichever occurs later. *Zimmie v. Calfee*, 43 Ohio St.3d 54, 58 (1989); *Krzywicki v. Gay*, 2017-Ohio-5584, ¶ 14 (8th Dist.).

{¶ 16} Thus, in order for S&C to have had a legal-malpractice claim against the Cavitch defendants to even implicate the one-year statute of limitations, it obviously had to have had an attorney-client relationship with the defendants. The Cavitch defendants contend that, under the authority of *New Destiny*, 2011-Ohio-2266, they did not have an attorney-client relationship with S&C.

{¶ 17} In *New Destiny*, the plaintiff was a nonprofit corporation that operated a rehabilitation center for individuals with substance-abuse problems; its board members were relatives of the founder and president. The president came under investigation for abuse of the organization's tax-exempt status and the use of funds for personal and otherwise inappropriate purposes. When the president became aware he was being investigated, he invited two other individuals to join the board, ostensibly to make it appear that the organization had a neutral board as opposed to one made up of family members.

{¶ 18} The two newly added board members discovered that the organization was $30 to $40 million in arrears on certain bills, despite generating $3 to $4 million a month in charitable contributions. The board retained the law firm of Vorys, Sater, Seymour & Pease, L.L.P. as legal counsel in response to the investigations into the president's alleged misuse of the organization's tax-exempt status and the president's alleged misuse of charitable funds.

{¶ 19} Meanwhile, a majority of the board became concerned that the president's leadership threatened the organization's ministry and, therefore, the board placed him on a six-month leave of absence. Another board member (the president's nephew) resigned his position on the board, was appointed as executive director, and was assigned to take over the president's duties. The board then replaced the newly named executive director with an interim CEO and a management team.

{¶ 20} The president, who, as mentioned, had been on leave, eventually began reasserting control over the nonprofit. The board had concerns and extended the president's leave of absence indefinitely. The two newly added board members believed the extended leave relieved the president of all executive authority. One of the two newly added board members scheduled a board meeting for December 4, 2000, to discuss the investigation into the president's conduct, to remove the president and his brother-in-law from the board, and to force the president to retire.

{¶ 21} The president hired attorney E. Marie Wheeler ("attorney Wheeler") and the law firm of Roderick Linton for the purpose of representing his desire to

retain control of the board. The president scheduled a board meeting for earlier in the day of December 4, 2000, the same day a board meeting was scheduled by the newly added board member who sought to oust the president. Attorney Wheeler prepared a special meeting agenda that included removing the newly added board member who scheduled the meeting to fire the president. Retaining Roderick Linton to represent the nonprofit was also an agenda item.

{¶ 22} At both December 4, 2000 board meetings, the moving factions were unable to reach a quorum and therefore neither succeeded in removing the other from the board.

{¶ 23} Two days later, on December 6, 2000, the president changed the locks on the organization's building, fired the board-appointed management team, and informed the employees that he had control of the nonprofit. When the board member leading the charge to oust the president learned of the president's actions and arrived at the nonprofit's building, the president purported to remove him from the board and attorney Wheeler ordered the board member to leave the premises.

{¶ 24} Thereafter, the president scheduled a teleconference meeting of the board for December 11, 2000. The two new board members were given notice of the meeting and planned at the meeting to seek removal of the president and the president's brother-in law from the board; however, neither of the new board members were permitted to participate at the meeting.

{¶ 25} At the meeting, the president and the board members in attendance claimed that the president's brother-in law had not resigned from the board but

rather had returned from a leave of absence. The president further found that a quorum existed and thus purported to remove the two newly added board members from the board and elect a new slate of trustees more favorable to the president. Additionally, the president informed the board that he had retained attorney Wheeler on behalf of the organization.

{¶ 26} That same day, the attorney general, and the two new board members filed an action in the name of the nonprofit against the president and others to recover funds misappropriated from the organization. Attorney Wheeler filed a notice to voluntarily dismiss the action on behalf of the nonprofit. The attorney general and the two new board members moved to strike the notice and asserted that attorney Wheeler and another Roderick Linton attorney represented only the president and the other defendants, but were not the attorneys for the nonprofit.

{¶ 27} In late December 2000, the attorney general and the two newly added board members filed a separate action on behalf of the nonprofit in the Ninth District Court of Appeals seeking a writ of quo warranto to restore the two board members as members of the organization's board of trustees. They alleged that the president had usurped control over the organization and operated it without corporate authority to do so.

{¶ 28} In February 2001, attorney Wheeler ended her association with the Roderick Linton firm, and in April 2001, the common pleas court appointed a receiver for the nonprofit. The receiver formally terminated attorney Wheeler as counsel for the organization. Attorney Wheeler continued to represent the president

in the proceeding, until she withdrew in August 2001. The trial litigation continued with new defense counsel and resulted in an over $2 million jury verdict against the president.

{¶ 29} In October 2001, the Ninth District Court of Appeals entered summary judgment in the quo warranto case in favor of the attorney general, finding that the president's brother-in-law had not taken a leave of absence from the board of trustees but had resigned from that position. The court therefore determined that the December 11, 2000 meeting, during which the president had attempted to oust the two newly added board members from the board, was invalid for lack of a quorum, and moreover, any and all actions taken at the meeting were invalid and void. *State ex rel. Montgomery v. Hawthorne*, 2001-Ohio-1404 (9th Dist.).

{¶ 30} Subsequently, the nonprofit filed a legal malpractice action against attorney Wheeler and the Roderick Linton firm. The organization contended that attorney Wheeler and the firm breached their obligations as attorneys and had negligently represented that a quorum had been present at the December 11, 2001 meeting, which allowed the two newly added board members to be removed from the board and left the president in control of the nonprofit.

{¶ 31} Attorney Wheeler and the firm moved for summary judgment. The trial court granted their motion, finding that there was never an attorney-client relationship between the attorneys and the nonprofit. The trial court reasoned that "'the opposite is true: the current parties had an adversarial relationship * * *. The

factions had separate interests, separate Boards, and separate attorneys.'" *New Destiny*, 2011-Ohio-2266, at ¶ 18, quoting the trial court.

{¶ 32} On appeal, the Ninth District reversed, finding that there was a genuine issue of material fact as to whether an attorney-client relationship had existed. Specifically, the court found that because the president hired attorney Wheeler in his capacity as president of the organization, there was a genuine issue of material fact regarding the existence of an attorney-client relationship. *New Destiny Treatment Ctrs., Inc. v. Wheeler*, 2009-Ohio-6956 (9th Dist.).

{¶ 33} The Supreme Court of Ohio accepted the matter on discretionary appeal for consideration of the following question: "whether an attorney retained by a dissident member of a nonprofit corporation's board of trustees in an effort to gain control of the corporation may subsequently be sued for malpractice by the corporation." *New Destiny*, 2011-Ohio-2266, at ¶ 23.

{¶ 34} The Court stated that the important considerations in determining whether an attorney-client relationship was created are the manifest intentions of the attorney and prospective client. *Id.* at ¶ 26.

> A relationship of attorney and client arises when a person manifests an intention to obtain legal services from an attorney and the attorney either consents or fails to negate consent when the person has reasonably assumed that the relationship has been established. 1 Hazard & Hodes, The Law of Lawyering (2005) 2-8, Section 2.5; 1 Restatement of the Law 3rd, The Law Governing Lawyers (2000) 126-128, Section 14. Thus, the existence of an attorney-client relationship does not depend on an express contract but may be implied based on the conduct of the parties and the reasonable expectations of the putative client.

Id.

{¶ 35} The Supreme Court found that the nonprofit had not met its burden to establish the existence of an attorney-client relationship between the organization and Wheeler or Roderick Linton. The court further held that "no evidence of such a relationship exists." *Id.* at ¶ 31. The court reasoned as follows:

> [T]he putative client is a corporate entity, and an attorney employed or retained by a corporation represents the organization acting through its constituents; the attorney does not owe allegiance to a stockholder, director, officer, or other person connected with the corporation. Prof.Cond.R. 1.13(a); former EC 5-19. Thus, because a corporate attorney represents the organization acting through its agents, id., in order to form an attorney-client relationship with a corporation, the party hiring counsel on behalf of the corporation must necessarily have authority to do so and must reasonably believe that an attorney-client relationship has been established.

Id. at ¶ 27.

{¶ 36} The Court specifically found that although the president, in his official capacity, had purportedly retained attorney Wheeler and the Roderick Linton firm in December 2000, he had been placed on a leave of absence by the board at that time. Thus, the president lacked authority in his capacity as president to retain counsel on behalf of the organization in December 2000.

{¶ 37} The parallels of *New Destiny* and this case demonstrate that *New Destiny* controls. In *New Destiny*, the dissident individual was the president; here, the dissident individual was Smith. In both cases, the attorneys representing the dissident member filed motions on behalf of the dissident and the partnership at the direction of the dissident, while the opposing faction argued the attorneys lacked authority to represent the partnership.

{¶ 38} In the underlying action here, Condeni argued in his counterclaim that Smith withdrew from S&C as of March 2, 2015, became a dissociated partner, and lost all rights and duties as an S&C partner at that time. He asserted affirmative defenses contending the same. Condeni maintained that position on appeal in the underlying action. Simply, it was always Condeni's contention that Smith lacked the authority to represent S&C.

{¶ 39} Indeed, in the appeal for the underlying case this court agreed with Condeni. Specifically, this court stated that "if Smith effectively disassociated from S&C prior to the filing of the underlying action, he lacked authority to act on behalf of S&C . . . ." *Smith & Condeni*, 2023-Ohio-1480, at ¶ 22. This court went on to find that "[a]ccording to the express terms of the S&C Partnership Agreement, [Smith] ceased to be a partner and no longer had authority to act on behalf of S&C on December 29, 2014, at the latest." *Id.* at ¶ 36. Thus, the panel concluded that "after December 29, 2014, Smith ceased being a partner at S&C, and therefore . . . he no longer could seek Condeni's expulsion or hire legal counsel to pursue a claim on behalf of S&C to those ends." *Id.* at ¶ 37.[2]

{¶ 40} As *New Destiny* instructs, "in order to form an attorney-client relationship with a corporation, the party hiring counsel on behalf of the corporation must necessarily have authority to do so . . . ." *New Destiny*, 2011-Ohio-2266, at ¶ 27. For the reasons discussed, Smith did not have authority to form an attorney-

---

[2] We note that the doctrine of judicial estoppel prevents a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding. *Greer-Burger v. Temesi*, 2007-Ohio-6442, ¶ 25.

client relationship on behalf of S&C with Dehn and Maruna. There was no privity between S&C and Smith. The trial court properly granted judgment on the pleadings as to S&C's malpractice claim against Dehn and Maruna. Because we hold that Dehn and Maruna did not represent S&C, it necessarily follows that the remaining Cavitch defendants did not as well.

{¶ 41} Finally, we consider whether S&C pled factual allegations to support a third-party legal malpractice claim.

{¶ 42} Under Ohio law, "an attorney may not be held liable by third parties as a result of having performed services on behalf of a client, in good faith, unless the third party is in privity with the client for whom the legal services were performed, or unless the attorney acts with malice." *Simon v. Zipperstein*, 32 Ohio St.3d 74, 76 (1987), citing *Scholler v. Scholler*, 10 Ohio St.3d 98 (1984), paragraph one of the syllabus. "Attorneys have a qualified immunity from liability to third parties for acts or omissions concerning the representation of a client." *LeRoy v. Allen, Yurasek & Merklin*, 2007-Ohio-3608, ¶ 15. As the Supreme Court of Ohio explained, "The rationale for this posture is clear: the obligation of an attorney is to direct his [or her] attention to the needs of the client, not to the needs of a third party not in privity with the client." *Simon* at *id*.

{¶ 43} In this context, malice has been defined as "the state of mind under which a person intentionally does a wrongful act without a reasonable lawful excuse and with the intent to inflict injury under circumstances that the law will imply an evil intent." *Criss v. Springfield Twp.*, 56 Ohio St.3d 82, 84-85 (1990), citing *Black's*

*Law Dictionary* 956 (6th Ed. 1990). In other word, malice means "an improper purpose, or any purpose other than the legitimate interest of bringing an offender to justice." *Criss* at 85, citing *Black's Law Dictionary* at *id.*, and Keeton, Dobbs, Keeton & Owen, *Prosser and Keeton on the Law of Torts*, § 119, at 883 (5th Ed. 1984).

{¶ 44} In its complaint, S&C alleged that the Cavitch defendants acted maliciously by putting Smith's interests over S&C's interests. That allegation did not rise to the level of malice because the Cavitch defendants represented Smith, a dissident member of S&C, who did not have authority to retain legal representation on behalf of S&C. Thus, the Cavitch defendants' duties and obligation were to Smith, and fulfilling them was neither malpractice nor malicious. Further, S&C did not allege privity with Smith in its complaint.

{¶ 45} On this record, after construing S&C's complaint most favorably to S&C, we find beyond doubt that S&C could not prove any set of facts in support for its claim for relief. Thus, the trial court did not err in granting the Cavitch defendants' motion for judgment on the pleadings and S&C's sole assignment of error is overruled.

{¶ 46} Judgment affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
TIMOTHY W. CLARY, J., CONCUR